1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JEREMY GILMORE AND DANA
     GILMORE,
11
                     Plaintiffs,                    Civ. No. S 09-2180 KJM DAD
12            vs.

13   UNION PACIFIC RAILROAD COMPANY,
     et al.,
14
                     Defendants.
15   _____/

16            This case was on calendar on June 8, 2011 for argument on the parties' cross-

17   motions for summary judgment.  Larry Lockshin appeared for plaintiffs; Stephanie Quinn and

18   Brian Plummer appeared for defendants.  Plaintiffs move for summary judgment on their fourth

19   and seventh causes of action and on several of defendant's affirmative defenses.  Defendant

20   moves for summary judgment on all of plaintiffs' causes of action and on their claim for punitive

21   damages.

22   I.  Background

23            Plaintiffs Jeremy and Dana Gilmore allege that after Jeremy was injured on the

24   job, defendant Union Pacific Railroad (UP) and certain individual defendants fired Jeremy for

25   exaggerating his injuries after they became aware that he intended to file an action under the

26   Federal Employers' Liability Act (FELA), 45 U.S.C.§§ 51, *et seq*.  Plaintiffs allege Jeremy's

                                              1

termination was in accordance with UP's policy of retaliating against employees who report on-the-job injuries and intend to pursue claims for the injuries.  They also allege that Dana, Jeremy's wife and a supervisor at UP, was falsely accused of dishonesty for failing to provide information to UP about the extent of Jeremy's injuries and ultimately wrongfully discharged. With these facts as the backdrop to their second amended complaint, they alleged nine causes of action for negligence (Jeremy), wrongful discharge in violation of public policy (Jeremy), intentional infliction of emotional distress (Jeremy and Dana), wrongful discharge for the assertion of the right to marital privacy (Dana), wrongful discharge because of marital status discrimination (Dana), retaliation (Dana), intentional infliction of emotional distress (Jeremy and Dana) and invasion of privacy (Jeremy and Dana).[1]  ECF No. 20.

In an order filed May 21, 2010, the court dismissed with prejudice the claims for intentional infliction of emotional distress and Dana's claim for marital status discrimination and dismissed the remaining individual defendants from the lawsuit. ECF No. 44.  Accordingly, the only causes of action remaining in this suit are the first cause of action for negligence, the second cause of action for Jeremy's wrongful discharge in violation of public policy, the fourth cause of action for Dana's wrongful discharge for her assertion of her right to marital privacy, Dana's sixth cause of action for retaliation, and Dana and Jeremy's seventh cause of action for invasion of privacy.  Dana has conceded, however, that her claim of retaliation is unfounded.  ECF No. 210 at 33.

II.  Standards For Summary Judgment

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be /////

---

[1]  The Second Amended Complaint (SAC) includes two causes of action assigned the number seven.  Only one of these, invasion of privacy, is currently before the court.

1   resolved only by a finder of fact because they may reasonably be resolved in favor of either

2   party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[2]

3           The moving party bears the initial burden of showing the district court "that there

4   is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477

5   U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish that

6   there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

7   475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts

8   of materials in the record . . .; or show [] that the materials cited do not establish the absence or

9   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

10  support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the

11  nonmoving party] must do more than simply show that there is some metaphysical doubt as to

12  the material facts").  Moreover, "the requirement is that there be no *genuine* issue of *material*

13  fact . . . .  Only disputes over facts that might affect the outcome of the suit under the governing

14  law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48

15  (emphases in original).

16           In deciding a motion for summary judgment, the court draws all inferences and

17  views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at

18  587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

19  whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

20  issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities*

21  *Service Co.*, 391 U.S. 253, 289 (1968)).

22  /////

23  ////

24

25        [2] Rule 56 was amended, effective December 1, 2010.  However, it is appropriate to rely
on cases decided before the amendment took effect, as "[t]he standard for granting summary
judgment remains unchanged." FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010

26  amendments.

III. <u>Evidentiary Objections</u>

Each side objects to portions of the others' evidence. Defendant objects to many of plaintiffs' deposition excerpts as well as several other of plaintiffs' exhibits, but in its response to plaintiffs' separate statement of undisputed facts in opposition to defendant's motion for summary judgment, defendant agrees that some of the facts, though not relevant, are undisputed. *Compare* ECF No. 225-1 *with* ECF No. 226.

Both parties have submitted excerpts from the many depositions taken in this case, though only a few excerpts are properly authenticated. *See* ECF No. 209-4 at 45-50; excerpts of deposition of Andrew Ribbing); *Orr v. Bank of America*, 285 F.3d 764, 774 (9th Cir. 2002) ("a deposition or excerpt therefrom is authenticated in a motion for summary judgment when it identifies the name of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent"); *Chao v. Westside Drywall, Inc.*, 709 F.Supp.2d 1037, 1051 (D. Or. 2010) (blank, unsigned reporter's certificate not sufficient authentication); *Kesey v. Francis*, 2009 WL 909530, at *3 (D. Or. Apr. 3, 2009) (collecting cases re: authentication of transcripts). Consonant with the court's obligation to consider only authenticated documents in resolving motions for summary judgment, this court will not rely on the unauthenticated excerpts. *Orr*, 285 F.3d at 733.

In addition, plaintiffs have submitted a number of e-mails without any attempt to identify their provenance. Defendant objects to many of these exhibits, but in response to some of plaintiffs' statements of facts, acknowledge that some of the e-mails were sent. For example, defendant does not dispute the fact that Diana Anderson, Director of Maintenance Processes at Roseville, sent an e-mail to Andrea Gansen, Vice-President of Labor Relations, about Dennis Magures' desire "to cite employee Jeremy Gilmore as being accident prone" and noting she had asked Dennis to send the information for Gansen's review. Nor does defendant dispute the fact that on August 19, Parker e-mailed Lynn Beebe disagreeing that Jeremy would be a proper
/////

1  candidate for the "Noggin Award," given to one whose hard hat deflected serious injury.  ECF

2  No. 226 ¶ 231 & 232; *see* ECF No. 213 at 23, 25-26.  Defendant's acknowledgment that these e-

3  mails were sent authenticates them sufficiently for purposes of this motion.  While defendant

4  objects that the contents are hearsay, a statement "by the party's agent or servant concerning a

5  matter within the scope of the agency or employment, made during the existence of the

6  relationship" is not hearsay.  FED. R. EVID. 801(d)(2)(D); *Sea Land Service, Inc.* v. *Lozen Intl.,*

7  *LLC*, 285 F.3d 808, 821 (9th Cir. 2002).  The contents of these e-mails show that they concerned

8  "a matter within the scope of the . . . employment," as they dealt with the response to Jeremy's

9  own-the-job injury.  They are admissible.

10  IV.  Undisputed Facts Relating To All Causes Of Action

11          In connection with their cross-motions for summary judgment, the parties

12  submitted lengthy statements of undisputed and disputed facts and many pages of exhibits.

13  Many of plaintiffs' undisputed and disputed facts are repetitive and argumentative; several of

14  defendant's declarations were filed twice.  *See, e.g.*, ECF No. 210-3 ¶¶ 210, 211; *compare* ECF

15  Nos. 200-3 and 209-4.  At the court's request, the parties have submitted a joint statement of

16  undisputed facts and separate statements of undisputed and disputed facts.  In this section of

17  background facts, the court draws from the joint statement and from other materials in the

18  record, including the parties' other statements of facts, when there are no disputes.  Facts specific

19  to the causes of action will be included in the discussion of those causes of action below.

20          Jeremy Gilmore began working for UP in November 1999 as a shop laborer.

21  ECF No. 235 ¶ 3.  His wife, Dana, started with UP the following year and was promoted to a

22  supervisory position in March 2007.  ECF No. 235 ¶ 5.  Dana was not Jeremy's supervisor.  ECF

23  No. 235 ¶ 63.  Both signed UP's "Terms and Conditions Of Employment," in which they

24  acknowledged their obligation to adhere to UP's rules, orders and instructions and to serve the

25  company honestly and loyally.  ECF No. 235 ¶¶ 4, 6.  In addition, as a supervisor, Dana was

26  /////

responsible for reporting fraud upon the company and was aware that UP's rules applied to all

employees regardless of marital status.  ECF No. 235 ¶ 23.

V.  Analysis

    A.  Personal Injury/FELA (First Cause of Action)

        Jeremy contends that on August 14, 2008, he was standing on a ladder fastening

the door of an air compartment on a locomotive engine after completing mechanical tests when

the door came open and fell on his head and body, causing injury to his head, neck and

shoulders.  SAC ¶¶ 4-7.  He alleges that the air compartment door latches and hinges "were

defective and unsafe for their intended use, because the subject door latches and hinges had not

been properly inspected, maintained, and repaired" and were "defective and unsafe for their

intended use;" that UP had failed to provide him a safe manner of closing the door that did not

expose his head and body to the force of the door should it fall; and that UP thereby negligently

and carelessly breached its duty to provide Jeremy with a reasonably safe work environment.

SAC ¶ 6.  These acts and omissions, he contends, violate the Federal Employers Liability Act

(FELA), 45 U.S.C. §§ 51, *et seq.*

        According to UP, Jeremy's FELA claim is based in part on the design of the

locomotive air compartment door and on his contention that UP was negligent for not installing

lighter doors made of fiberglass, and failing to use a different latch and hinge configuration for

the air compartment doors and to install a third latch.  ECF No. 200 at 12.  Jeremy does not

dispute this characterization of his theory, which he has pursued through the numerous discovery

disputes in this case.  *See, e.g.*, ECF No. 190 (in motion to compel inspection, asserting that

"plaintiff contends that the air compartment door latch system on Locomotive Engine 9643 could

have and should have been provided on the locomotive on which plaintiff was working").

        In this motion, UP argues that the design defect portion of Jeremy's FELA claim

is precluded by the Locomotive Inspection Act (LIA) and its regulations.  It offers a declaration

from Michael Iden, UP's General Director of Car and Locomotive, who couches legal

conclusions about the reach and scope of the LIA as factual assertions, which the court will not credit.  *See* ECF No. 200-6 ¶¶ 1-2; *Evangelista v. Inlandboatmen's Union of Pacific*, 777 F.2d 1390, 1398 n.3 (9th Cir. 1985) (lay witness testimony on correct interpretation of collective bargaining agreement not admissible).  Jeremy counters with information about the design and maintenance of the air compartment door, which the court does not find relevant to the narrow issue presented by UP's motion.  *See, e.g.,* ECF No. 237 ¶¶ 1-6, 10.

FELA allows railroad workers to recover for injuries suffered "by reason of any defect, or insufficiency, due to its negligence, in its . . . engines, appliances, machinery . . . or other equipment."  45 U.S.C. § 51.  Although the elements of a FELA claim are the same as those for a claim of common law negligence, the statute was designed "to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions. . . ."  *Lewy v. Southern Pacific Transp. Co*., 799 F.2d 1281, 1287 (9th Cir. 1986) (purpose of FELA); *Glow v. Union Pacific Railroad Co*., 652 F.Supp.2d 1135, 1141 (E.D. Cal. 2009) (elements of common law negligence).  The Locomotive Inspection Act (LIA), on the other hand, provides that a railroad may use a locomotive "only when the locomotive . . . and its parts and appurtenances – (1) are in proper condition and safe to operate without unnecessary danger of personal injury . . . ."  49 U.S.C. § 20701.  The LIA, and its predecessor the Boiler Inspection Act, "supplement[] the Federal Employers' Liability Act by imposing on interstate railroads 'an absolute and continuing duty' to provide safe equipment."  *Urie v. Thompson*, 337 U.S. 163, 188 (1949).  These statutes are "substantively, if not in form amendments to the Federal Employers' Liability Act," because a worker who is able to show a violation of the LIA has shown FELA negligence as a matter of law.  *Id*.; *Grogg v. CSX Transportation*, 659 F.Supp.2d 998, 1006 (N.D. Ind. 2009).  Nevertheless, not all violations of FELA constitute LIA violations because "FELA allows recovery in a broad range of situations, while liability under the LIA occurs under more narrow circumstances."  *Monheim v. Union*

/////

1   *Railroad Co.,* __ F.Supp.2d ___, 2011 WL 1527798, at *3 (W.D. Penn. Apr. 20, 2011).  Jeremy

2   does not raise a LIA claim, as explained below.

3            Federal courts have held that the BIA and LIA and the regulations adopted to

4   implement them, as well as the Federal Railroad Safety Act (FRSA), preempt state laws that

5   cover the same subject matter.  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 675 (1993);

6   *Napier v. Atlantic Coast Line R. Co.,* 272 U.S. 605, 612-13 (1926) (finding state laws requiring

7   locomotives to have doors on the firebox and cab curtains preempted "because the Boiler Act . . .

8   was intended to occupy the field"); *Law v. General Motors Corp*., 114 F.3d 908, 909 (9th Cir.

9   1997) (BIA preempts state common law remedies against railroad manufacturers arising from

10  alleged design defects).

11           Defendant argues that because the LIA regulates "the design, construction, and

12  the material of every part of the locomotive . . . and of all appurtenances," *Napier*, 272 U.S. at

13  611, Jeremy's design defect claim is precluded by the LIA, which does not require that the air

14  brake compartment doors be made of fiberglass or have different or additional latches.  They cite

15  several cases in which courts have found preclusion.  In *Waymire v. Norfolk and Western*

16  *Railway Co.,* 218 F.3d 773, 776 (7th Cir. 2000), the Seventh Circuit found a FELA claim based

17  on unsafe speed to be precluded by FRSA when a train was traveling within FRSA prescribed

18  limits.  *See also Dickerson v. Staten Trucking, Inc*., 428 F.Supp.2d 909, 914 (E.D. Ark. 2006)

19  (compliance with FRSA regulations regarding cab seats precluded FELA claim); *Monheim*, 2011

20  WL 1527798, at *4 (compliance with FRSA precludes various FELA design defect claims).  One

21  court in this district has ruled that LIA regulations on cab safety precluded a FELA claim based

22  on the failure to install seatbelts or padding.  *Tucker v. BNSF Railway Co.*, 2008 WL 3286748, at

23  *2 (E.D. Cal. Aug. 6, 2008); *but see Glow*, 652 F.Supp.2d at 1142 (recognizing lack of 9th

24  Circuit authority on the question).

25  /////

26  /////

8

1      Other courts have recognized that while the law may be clear on federal

2  preemption of state regulation of railroads, "the FRSA only explicitly preempts state laws,

3  regulations and orders . . . [but] is silent as to whether 'other federal safety standards' are

4  precluded." *McCain v. CSX Transportation, Inc*., 708 F.Supp.2d 494, 502 (E.D. Penn. 2010).  In

5  *Grogg*, 659 F.Supp.2d at 1011, the Indiana district court recognized "the degree to which this

6  preclusion applies to FELA claims remains a developing part of the law and there is clearly no

7  bright line test for applying preclusion.  Preclusion analysis must still be applied on a claim by

8  claim basis."  The court in *Grogg* concluded that while there may be preclusion "when the issue

9  raised by a FELA claim is directly covered by a regulation issued pursuant to the LIA,"

10 preclusion "is not absolute simply because language in the LIA or one of its accompanying

11 federal regulations could be argued to 'occupy the field' in a broad sense." *Id*. at 1012, 1013-14.

12 And in *Mosco v. Baltimore & Ohio Railroad*, the Fourth Circuit said,

13          although Mosco had no viable Boiler Inspection Act claim based
           on the absence of protective devices from the windows of the
14         locomotive's cab, it is possible that he might have stated a
           meritorious FELA claim based on the same facts.  As the Supreme
15         Court has indicated, devices or equipment that do not fall within
           the coverage of the Boiler Inspection Act are not therefore
16         excluded from the usual rules of liability.

17 817 F.2d 1088, 1092 (4th Cir. 1987).

18      In light of the policies behind the LIA and FELA, this court does not find that

19 LIA precludes all FELA claims stemming from problems with "parts and appurtenances."  As

20 the Supreme Court has said, the Safety Appliance Acts and the BIA "hav[e] the purpose and

21 effect of facilitating employee recovery, not of restricting such recovery or making it possible."

22 *Urie*, 337 U.S. at 189.  Determining that the LIA is broadly preclusive runs counter to its

23 purpose as described by the Supreme Court.

24      Based on the record on the pending motion, however, the court need not

25 determine whether a specific regulation precludes a FELA claim.  Defendant cites only one

26 regulation concerning doors on locomotive engines:  49 C.F.R. § 229.85, which provides for

warnings on doors guarding high voltage equipment.  It has not cited the court to any regulations concerning the requirements for locomotive doors in general or doors for air brake compartments in particular.[3]  Jeremy's FELA claim based on principles of design defect is not precluded.

B.  The Discharges (Second and Fourth Causes Of Action)

In the SAC, Jeremy alleges that after his injury, his supervisors cited him for violation of various UP rules, based on a claim that he was falsifying or exaggerating the extent of his injuries.  SAC ¶ 14.  UP did not present any evidence from a doctor or other medical provider at the disciplinary hearing but nevertheless discharged Jeremy after the hearing officer found him guilty of the charges.  Id. ¶ 15.  Defendant was aware that Jeremy intended to pursue a FELA claim and so pursued the baseless dismissal as part of a general policy of retaliation against employees "who report having been injured at work and/or who are known or believed by Union Pacific of [sic] intending to make a claim for damages arising out of an on-the-job injury. . . ."  Id. ¶ 17.  Jeremy also alleges that the discharge was motivated in part by the bonuses UP paid to the managers who participated in Jeremy's wrongful discharge and discipline.  Id. ¶ 18.  This discharge, he says, violated California Labor Code § 132a, the Federal Rail Safety Act, 49 U.S.C. § 20109(a)(4) and California public policy because UP was aware Jeremy intended to pursue a FELA claim.  Id. ¶ 19.

On August 14, 2008, Jeremy reported the air compartment door of locomotive UP7163 had not latched properly and had fallen on him; he was taken for a medical examination that afternoon.  ECF No. 235 ¶¶ 7-8.  The doctor diagnosed neck strain, but did not impose any work restrictions.  ECF No. 201-4 at 17; ECF No. 235 ¶ 8.  Dana was present during that examination, but did not accompany Jeremy to other medical appointments.  ECF No. 201-4

---

[3]  Although defendant has made no attempt to connect air compartment doors with doors for high voltage equipment, some of plaintiffs' exhibits suggest that locomotive air brakes incorporate some high voltage equipment.  See ECF No. 218 at 25.  Even if the doors at issue may be deemed to guard high voltage equipment, the court does not find that a single reference to a warning sign precludes a challenge to the operational design of the door.

1   ¶ 18.  Even so, she was aware that after a later appointment, the doctor added to Jeremy's work

2   restrictions that he not wear a hard hat.  ECF No. 235 ¶ 26.

3          When Jeremy returned to work on August 15, he filled out an accident report,

4   describing his injuries as a headache and whiplash, causing a very sore and stiff neck and

5   attributing the incident to a defective door latch and bent door.  ECF No. 210-1 ¶ 10; ECF No.

6   211 at 7-8.  John Parker, the Mechanical Manager who investigated the accident, did not find

7   any violation of railroad rules and did not charge Jeremy for the incident.  ECF No. 226 ¶ 251.

8          On August 16, Dana asked to stay home with the couple's children because

9   Jeremy was in pain.  ECF No. 235 ¶ 9.

10         On August 18, Jeremy brought a new work status report, which included

11  restrictions on overhead work or repetitive neck motion.  ECF No. 201-1 ¶ 10.  Jeremy told John

12  Parker he believed he could continue to work despite the restrictions.  ECF No. 235 ¶ 10.  He

13  worked full days on August 18 through 20 and for seven hours on August 21.  ECF No. 235 ¶ 60.

14  At his chiropractor's suggestion, Jeremy had deep tissue massage on the afternoon of the 21st.

15  ECF No. 201-4 at 12 ¶ 8.

16         On August 19, Lynn Beebe, Director of Safety Process and Program

17  Development, e-mailed John Parker about giving Jeremy the "Noggin Club" award, given to an

18  employee whose hard hat prevents a more serious injury.  ECF No. 213 at 23.  Parker responded

19  that he

20       discussed the award with our Director, Dennis Magures and Sr.
     Manager, Leo Marin.  Mr. Gilmore is working and appears to be

21       Okay.  However, his injury has turned into a reportable. [¶] Our
     concern with giving Mr. Gilmore this award is, this is his third

22       personal injury on duty and second reportable.  He has been
     involved in another reportable where his partner was struck in the

23       face with a chisel.  He also was dismissed and brought back under
     a leniency agreement for instructing employees to perform an

24       unsafe task with him assisting while working as a supervisor.  I
     believe the "Noggin Club" is a very good award for those who

25       where [*sic*] their hard hats properly and avoid serious injury . . . .
     [¶] In this instance, if Mr Gilmores [*sic*] incident was and [*sic*]

26       isolated event and not clouded by such a dismal safety past, this

1            recognition would be absolutely in order.  However, I would not
2            particularly want to reward someone who undoubtedly continues
             to perform unsafe acts.

3  ECF No. 213 at 25.

4           On Friday, August 22, after working half an hour, Jeremy told Parker he was

5  going to a chiropractic appointment; he did not return to work that day.  ECF No. 235 ¶ 11.

6           Dennis Magures, the Director of Locomotive Shop at UP's Roseville Facility,

7  decided to initiate surveillance of Jeremy because of his "impression that [Jeremy's] condition

8  suddenly seemed to change for the worse," despite Magures's observations of Jeremy around the

9  shop, which did not seem to suggest any mobility limitations.  ECF No. 209-2 at 3 ¶ 4

10  (Declaration of Dennis Magures).  He asked John Parker to arrange for surveillance.  ECF No.

11  226 ¶ 287.

12          Jeremy returned to work on Monday, August 25, after a follow-up with Dr.

13  Cohen, who prepared a work status report, recommending that Jeremy not be given a job that

14  required wearing a hard hat, climbing a ladder or bending and twisting.  ECF No. 201-4 at 12

15  ¶ 11 & ECF No. 201-4 at 19.  Jeremy told administrative employee Icela Thomson that he did

16  not think Parker would accommodate the restrictions.  When Thomson read the restrictions to

17  Parker, he agreed that UP could not accommodate them.  ECF No. 226 ¶¶ 278, 285; ECF No.

18  213 at 31 (Parker writes that Jeremy had restrictions that cannot be accommodated).

19          On September 2, 2008, Magures received a DVD of surveillance taken of Jeremy

20  on August 24, 27 and 28, 2008.  ECF No. 209-2 ¶ 5.  The August 24 surveillance DVD showed

21  Jeremy working on a race car in front of his house with Dana coming in and out of the area.

22  ECF No. 235 ¶ 12; ECF No. 209-2 ¶ 5.  Additional videotapes were taken on August 27,

23  showing Jeremy and Dana loading groceries into a car and Jeremy driving, and on August 28,

24  showing Jeremy and Dana working with a horse.  ECF No. 235 ¶¶ 12, 15-16; *see also* ECF No.

25  209-2 ¶ 6 & Ex. 1 (DVD).

26  /////

1    Around this time, UP's Roseville management contacted Preethan Jeyaram, the

2    Assistant Director of Labor Relations, about pursuing discipline against Jeremy.  ECF No. 200-7

3    ¶¶ 1-3.  He reviewed the medical documentation Jeremy had brought to work, watched the

4    surveillance video and talked to Parker and then determined the evidence was sufficient to

5    pursue disciplinary action against Jeremy.  ECF No. 200-7 ¶¶ 5, 12.

6    On September 3, UP received a progress report from Jeremy's doctor, stating that

7    the day before Jeremy had complained of continuing headaches and pain in his neck and upper

8    back and had reported that his safety gear was bothering his neck.  ECF No. 235 ¶ 16.

9    The next day, UP sent Jeremy a disciplinary letter charging him with violating

10   several provisions of UP's General Code of Operating Rules: 1.13, Reporting and Complying

11   with Instructions; 1.15, Reporting Absence; and 1.6, Dishonest Conduct.  ECF No. 17.  Rule

12   1.13 provides in part that "employees will . . . comply with instructions from supervisors. . . .

13   Employees will comply with instructions issued by managers of various departments. . . ."; Rule

14   1.15 provides in relevant part that "employees must report for duty at the designated time and

15   place with the necessary equipment to perform their duties . . . ."; Rule 1.6 provides that

16   employees "must not be . . . dishonest . . . ."  ECF No. 200-4 at 8-12.

17   UP's collective bargaining agreement with the International Association of

18   Machinists (IAM) provided for employees to receive formal disciplinary hearing before

19   discharge.  ECF No. 235 ¶ 18.  UP employee Carolyn Will conducted Jeremy's disciplinary

20   hearing on October 28, 2008; she was responsible for determining whether the evidence

21   supported the rules violations alleged against him.  ECF No. 200-4 ¶¶ 1-2, 4.  Jeremy was

22   present with two union representatives and had the opportunity to testify and present evidence.

23   ECF No 200-4 ¶ 5.  John Parker, the charging officer, testified, as did Icela Thomson, an

24   administrative employee.  ECF No. 200-4 ¶ 6.  Parker described Jeremy's initial medical

25   restrictions, his claim that his chiropractic appointment on the 21st had been so painful he had to

26   lie down afterward and his prediction that if his appointment on the 22nd was similarly painful,

1   he would not return to work.  ECF No. 200-4 ¶ 9.  Parker then presented the surveillance video

2   showing Jeremy working on a race car on August 24, followed by the additional work

3   restrictions Jeremy brought to work on August 25 – no bending, twisting, climbing ladders or

4   wearing a hard hat.  ECF No. 200-4 ¶ 11.  Thomson testified that on August 25, Jeremy said he

5   had severe neck pain.  This was followed by additional surveillance video, taken August 27 and

6   28, showing Jeremy turning his neck as he pulled out of a parking place and bending to put items

7   in a shopping cart and working with a horse.  ECF No. 200-4 ¶¶ 13-14.  Finally, Parker presented

8   a doctor's report from September 2, 2008, which concluded that Jeremy should not engage in

9   repetitive neck movements or wear a hard hat, because the safety gear was bothering his neck.

10  ECF No. 200-4 ¶ 15.  Ms. Will did not find Jeremy's reports of severe headaches credible

11  because many of the activities on the video appeared to be more strenuous than those Jeremy

12  would be required to perform at work.  ECF No. 200-4 ¶ 17.  She found him guilty of a Level 5

13  violation and terminated his employment.  ECF No. 235 ¶ 22.

14          The IAM, Jeremy's union, appealed the termination and Labor Relations Director

15  Jeyaram handled the appeal on UP's behalf, writing that because of the adversarial nature of

16  personal injury cases and the potential of a FELA suit, the claimants should be "closely

17  examined for their veracity."  ECF No. 235 ¶ 56.  After IAM's appeal was denied, it pursued the

18  case to the Public Law Board, which also upheld the determination.  ECF No. 200-7 ¶¶ 16-17 &

19  200-7 at 31-35.

20          Charging officer Parker also asked Toby Rees, the Director of Labor Relations for

21  UP's craft employees, whether there was enough information to pursue disciplinary charges

22  against Dana, based on Parker's belief that Dana should have known that Jeremy was

23  minimizing his injuries because they lived in the same household and had participated in several

24  of the activities pictured in the surveillance video.  ECF No. 235 ¶¶ 49-51.

25          In September, Dana was charged with violations of Rules 1.6, 1.13 and 1.2.7, the

26  latter of which provides "employees must not withhold information, or fail to give all the facts to

1    those authorized to receive information regarding . . . accidents, personal injuries, or rule

2    violation."  ECF Nos. 200-3 at 10 & 235 ¶ 25.  Dana avers she did not understand that these

3    rules constituted a waiver of her right to marital privacy or required her to report what Jeremy

4    had told her about his injury, treatment or condition.  ECF No. 201-4 at 7 ¶¶ 8-10.

5            UP's collective bargaining agreement with the American Railway and Airway

6    Supervisors Association, Dana's union, had procedures for discipline and investigation of

7    employees; under that agreement, Dana was entitled to a hearing on the charges against her.

8    ECF No. 235 ¶¶ 27-28.

9            Andrew Ribbing conducted the hearing on December 4, 2008 and asked Dana a

10   series of questions about her knowledge of the extent of Jeremy's injuries and his work

11   restrictions.  ECF No. 235 ¶¶ 30-40.  Before the hearing, no one from UP had asked Dana what

12   she knew about Jeremy's injury and physical condition.  ECF No. 235 ¶ 29.

13           A discharge letter was sent to Dana on December 22, 2008.  ECF No. 235 ¶ 42.

14           1.  Jeremy's Discharge (Second Cause of Action)

15           In *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167 (1980), the California

16   Supreme Court explored the nature of the remedy when an employer has fired an at will

17   employee and the employee claims the discharge followed his refusal to participate in a price

18   fixing scheme.  In that case, the employee alleged he was fired after such a refusal.  *Id*. at 169.

19   The court concluded that "when an employer's discharge of an employee violates fundamental

20   principles of public policy, the discharged employee may maintain a tort action and recover

21   damages traditionally available in such actions."  *Id*. at 170.

22           In subsequent decisions, the California Supreme Court has explored the contours

23   of the doctrine.  In *Gantt v. Sentry Ins*., 1 Cal. 4th 1083, 1090 (1992), the court said that "the

24   policy in question must involve a matter that affects society at large rather than a purely personal

25   or proprietary interest of the plaintiff or employer."  In *Stevenson v. Superior Court*, 16 Cal.4th

26   880, 894 (1997), the court developed a four part test for determining whether a particular policy

1    will support a discharge claim: the policy must be "(1) delineated in either constitutional or

2    statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather

3    than serving merely the interests of the individual; (3) well established at the time of the

4    discharge; and (4) substantial and fundamental."  And in *Green v. Ralee Engineering Co.*, 19

5    Cal.4th 66, 87-88 (1998), the court recognized that the policy underlying a discharge claim may

6    be federal statutory or administrative law.

7            Accordingly, in order to prove a claim for discharge in violation of public policy,

8    a plaintiff must show (1) an employee-employee relationship (2) the termination violated public

9    policy, (3) the termination was the legal cause of plaintiff's damage, and (4) the extent of the

10   damage.  *London v. Sears, Roebuck and Co.*, 619 F.Supp.2d 854, 862 (N.D. Cal. 2009); *Holmes*

11   *v. General Dynamics Corp.*, 17 Cal.App.4th 1418, 1427 (1993).

12           Defendant argues there is no evidence supporting Jeremy's claim that he was

13   discharged because defendant knew he intended to pursue a FELA action and that a *Tameny*

14   claim does not lie for a discharge following an injury.  ECF No. 200 at 14, 16.  Jeremy counters

15   he is not arguing he had a right to be injured, but rather that his reporting of the injury and the

16   hazardous condition that led to his injury is protected.

17           Although the parties disagree about the analysis governing such claims, they do

18   appear to agree that there must be some initial showing of a connection between the discharge

19   and an alleged violation of public policy.

20           The court agrees with defendant that plaintiff has presented no admissible

21   evidence that UP was aware that Jeremy intended to file a FELA claim.  Plaintiff has presented

22   evidence, however, that when he returned to work the day following the injury, he filled out an

23   accident report attributing his injuries to a defective door latch and bent door.  ECF No. 210-1

24   ¶ 10; ECF No. 211 at 7-8.  Although Parker did not find Jeremy to have violated workplace rules

25   leading to the accident, within a few days of the incident he noted that Jeremy's injury had

26   become "reportable" and discouraged Lynn Beebe from considering Jeremy for the Noggin Club

1   award because of his "dismal" safety record.  Even though Jeremy worked during the week of

2   August 18, sometime during that week Magures decided to have Jeremy's off-the-clock activities

3   videotaped.

4           Under 49 U.S.C. § 20109(a)(1)(4), a railroad employee is protected from adverse

5   employment action stemming from a report of a work-related injury or of a violation of any law

6   or rule relating to safety.  Although "public policy as a concept is notoriously resistant to precise

7   definition," workplace safety is a fundamental public policy in California.  *Gilmore v. Union*

8   *Pacific Railroad Co*., 2009 WL 4705427, at *3 (E.D. Cal. Dec. 2, 2009).  In this case, Jeremy

9   has raised an issue of material fact about the motivation for his discharge.

10           According to defendant, California courts apply the analysis outlined in

11   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) in resolving wrongful discharge cases.

12   In *McDonnell Douglas*, the Supreme Court established a three-part burden-shifting analysis for

13   Title VII cases: the plaintiff "must carry the  initial burden of establishing a prima facie case of

14   . . . discrimination;" the burden of production then shifts to the employer "to articulate some

15   legitimate, nondiscriminatory reason" for its action in order to meet the prima facie case. *Id*. at

16   802-04. The burden then returns to the plaintiff to show that the articulated reason is a pretext

17   "'by persuading the court that a discriminatory reason more likely motivated the employer or

18   indirectly by showing that the employer's proffered explanation is unworthy of credence.'"

19   *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1062 (9th Cir. 2002) (quoting *Chuang v.

20   University of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000)). The presumption of

21   discrimination "drops out of the picture" once the employer meets its burden of production, but

22   "the trier of fact may still consider the evidence establishing plaintiff's prima facie case" in

23   evaluating whether the employer's explanation is pretextual. *Reeves v. Sanderson Plumbing

24   Products, Inc*., 530 U.S. 133, 143 (2000).

25           California courts have used the *McDonnell Douglas* test in wrongful termination

26   claims, generally when those claims are based on violations of the state's Fair Employment

1  Housing Act, which are evaluated under the *McDonnell Douglas* framework.  *See*, *e.g.*, *Guz v.*

2  *Bechtel National, Inc*., 24 Cal.4th 317, 354 (2000); *Nelson v. United Technologies*, 74

3  Cal.App.4th 597, 613 (1999).  Courts in this district have applied this framework in evaluating

4  wrongful discharge claims even when they are not based on workplace discrimination.  *See Mitri*

5  *v. Walgreen Co*., 2011 WL 2181387 (E.D. Cal. June 3, 2011); *Anderson v. Union Pacific*

6  *Railroad Company*, 2008 WL 2130320 (E.D. Cal. May 21, 2008), *aff'd*, 359 Fed.Appx. 800 (9th

7  Cir. Dec. 4, 2009).

8          Jeremy urges that the proper standard is that developed in *Cotran v. Rollins Hudig*

9  *Hall Intl., Inc*., 17 Cal.4th 93 (1998).  In that case the California Supreme Court held that when

10  an employee hired under an implied agreement not to be discharged except for good cause is

11  fired for misconduct, a jury considering a suit stemming from the discharge must determine

12  whether "the factual basis on which the employer concluded a dischargeable act had been

13  committed was reached honestly, after an appropriate investigation and for reasons that are not

14  arbitrary or pretextual."  *Id*. at 107.  As Jeremy's counsel pointed out at argument, this is the

15  standard applied in *Nazir v. United Airlines*, 178 Cal.App.4th 243 (2009).  *See also London v.*

16  *Sears, Roebuck & Co*., 619 F.Supp. 2d at 862.  In *Nazir*, the California Court of Appeal applied

17  *Cotran* to evaluate the trial court's grant of summary judgment to the employer on plaintiff's

18  claim that his termination violated public policy because it was racially motivated.  *Nazir*, 178

19  Cal.App.4th at 271.  The *Cotran* framework is appropriate in light of UP's Statement of Policy

20  on Ethics, which provides that employees are considered to be "at will" unless they are covered

21  by a collective bargaining agreement.  ECF No. 202-4 at 27.

22          The court need not ultimately determine which standard applies in public policy

23  discharge cases; both the *Cotran* and *McDonnell Douglas* standards direct the court to consider

24  the basis of the discharge, the employer's reasons and any prextual nature of those reasons.

25  *Compare Cotran*, 17 Cal.4th at 107 (employer must have good cause for the discharge, which

26  cannot be a pretext for improper motives) *with McDonnell Douglas*, 411 U.S. at 802-04

1  (employer must demonstrate non-discriminatory reason for discharge, which employee may

2  rebut with evidence of pretext).

3        As noted above, the undisputed facts show that Magures and Parker decided to

4  undertake surveillance of Jeremy, even though he was working during the week of August 18,

5  based on "how the whole incident started and how he could function and then all of a sudden

6  overnight everything changed. . . ."  ECF No. 235 ¶ 57.  Defendant has presented no evidence,

7  apart from the Work Status reports, suggesting how Jeremy's actual performance of his job

8  changed after the accident or whether the first set of restrictions had a significant impact on his

9  performance.  Jeremy has presented evidence he filed a report blaming improper maintenance

10  and a defective product for his accident and that soon after this report, Parker lambasted his

11  safety record in an e-mail to Beebe and Magures decided to institute surveillance.

12        Whether UP is required to show it had a legitimate business reason or good cause

13  for the discharge, it has done so, by presenting evidence of Jeremy's activities as shown on the

14  surveillance videos and of his claimed work restrictions and the explanation that his supervisors

15  did not believe he was being honest about the extent of his injuries, in violation of UP's policies.

16  *See Mitri v. Walgreen*, 2011 WL 2181387, at *13 (employee's violation of policy is a facially

17  legitimate reason for discharge).

18        Nevertheless, viewing the evidence as required in the light most favorable to

19  Jeremy, the court finds he has presented sufficient, if not the strongest, evidence of pretext to

20  survive summary judgment.  As already noted, neither Parker nor Magures have described the

21  impact of the restrictions on Jeremy's work performance, yet on August 19, Parker told Beebe

22  that Jeremy was not a good candidate for the Noggin Club award because of his safety record;

23  this was despite having found no rules violation leading to Jeremy's accident.  Sometime during

24  that week, Parker and Beebe arranged for surveillance.  The proximity in time to Jeremy's report

25  suggests they may have been motivated by the report and its suggestion that a FELA claim was

26  in the offing.  *See Mitri*, 2011 WL 2181387, at *13 (timing of investigation may be significant).

1    In addition, there is no evidence in the record that Parker or Magures consulted Jeremy's doctor

2    or indeed any doctor about Jeremy's work restrictions or his injury.  Again, this evidence is not

3    the most compelling, but at the summary judgment stage it need not be.

4            Defendant argues that whatever might have prompted Magures and Parker to act,

5    they were not the ultimate decision makers and that Will and the others in UP's Omaha office

6    who viewed the videos ultimately concluded that the discharge was proper.  ECF 200 at 19-20.

7    In *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2004), a discriminatory discharge

8    case, the Ninth Circuit noted that when the decision-maker was not the source of racist remarks,

9    a plaintiff must show a nexus between the remarks and the decision-maker's actions.  It

10   concluded that plaintiff had not done so because the decision maker "conducted her own

11   thorough investigation. . . ." and there was no evidence linking the other manager's animus to the

12   decision maker.  *Id.* at 640; *see also Botros v. Lea*, 2010 WL 2232566, at *4 (S.D. Cal. June 1,

13   2010) (plaintiff must show nexus between decision maker and manager who made

14   discriminatory remarks).

15           Other courts have noted that if a disciplinary committee "'acted as the conduit of

16   [the supervisor's] prejudice–his cat's paw–the innocence of its members would not spare the

17   company from liability.'" *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277,

18   288 (4th Cir. 2004) (quoting *Shager v. Upjohn Co.*, 913 F.3d 398, 406 (7th Cir. 1990)); *see also*

19   *Reid v. Google*, 50 Cal.4th 512, 541-43 (2010) (surveying cases; determining that the decision

20   maker may be influenced by another's discriminatory animus).  Jeremy has presented evidence

21   that the contours of the investigation were shaped by Parker and Magures, that they relied on the

22   surveillance videos and the work restrictions and some vaguely described belief that Jeremy's

23   claimed injuries had changed overnight without making any contact with Jeremy's doctor

24   themselves.  Again, plaintiffs' evidence may not be strong, but it is not the court's function on

25   summary judgment to resolve factual disputes.  The evidence is enough to defeat summary

26   /////

1   judgment, for it raises a dispute about the impact of Parker's and Magures' motivations on the

2   subsequent investigation and termination.

3             2.  <u>Dana's Termination (Fourth Cause Of Action)</u>

4             Both parties seek summary judgment on the question of Dana's discharge.  There

5   appears to be no dispute in the factual record about the cause of Dana's termination: the parties

6   agree she was terminated because she did not notify UP about Jeremy's activities at home or

7   report anything she may have known about the relationship between his work restrictions and his

8   abilities.  Dana argues that termination on these grounds violates her right to marital privacy,

9   while UP contends that Dana's expectation of privacy was reduced because she agreed to abide

10  by UP's rules, that Dana did not suffer a serious invasion of privacy, and that UP had a

11  legitimate business interest in all employees' reporting dishonesty.

12            Under Article 1, Section 1 of the California Constitution,

13        [a]ll people are by nature free and independent and have

14  inalienable rights. Among these are enjoying and defending life
    and liberty, acquiring, possessing, and protecting property, and
    pursuing and obtaining safety, happiness, and privacy.

15

16  This provision protects against governmental and private intrusion.  *Semore v. Pool*, 217

17  Cal.App.3d 1087, 1094 (1990); *Gilmore v. Union Pacific Railroad*, 2009 WL 4705427, at *6

18  (E.D. Cal. Dec. 2, 2009).

19            In *Hill v. National Collegiate Athletic Assn*., 7 Cal.4th 1 (1994), the California

20  Supreme Court examined the nature of a cause of action for violation of privacy:

21        [A] plaintiff alleging an invasion of privacy in violation of the state

22  constitutional right to privacy must establish each of the following:
    (1) a legally protected privacy interest; (2) a reasonable

23  expectation of privacy in the circumstances; and (3) conduct by
    defendant constituting a serious invasion of privacy.

24  *Id*. at 39-40.  The first element is a question of law, and the last two elements are mixed

25  questions of law and fact.  *Id*. at 40.  "If the undisputed material facts show no reasonable

26  expectation of privacy or an insubstantial impact on privacy interests, the question of invasion

1  may be adjudicated as a matter of law." *Id*.  A defendant may prevail by negating any of these

2  elements, or by demonstrating, as an affirmative defense, "that the invasion of privacy is justified

3  because it substantively furthers one or more countervailing interests." *Id.*  In the face of such a

4  showing, a plaintiff may show that there are "feasible and effective alternatives" that meet

5  defendant's interest, but which have a lesser impact on privacy.  *Id*.

6          Defendant appears to agree that a spouse's expectation of privacy in marital

7  communications is reasonable in the abstract, but argues that Dana's expectation was diminished

8  because she agreed to abide by UP's rules about reporting dishonesty.  ECF No. 200 at 24-25.

9  California's recognition of the marital communications privilege, designed "to encourage

10  confidences between spouses for the benefit of the marital relationship," *People v. Johnson*, 233

11  Cal.App.3d 425, 437 (1991), suggests that society accepts privacy in marital communications as

12  reasonable.  *See* Cal. Evid. Code § 980; *see Ortiz v. Los Angeles Police Relief Assn., Inc*., 98

13  Cal.App.4th 1288, 1304 (a reasonable expectation of privacy is an objective entitlement based on

14  accepted community norms); *Pettus v. Cole*, 49 Cal.App.4th 402, 442 (1996) ("it is reasonable

15  for employees to expect that details of their personal lives and thoughts will be shielded from

16  scrutiny by their employers").

17          Determining that the expectation is reasonable does not end the inquiry: "even

18  when a legally cognizable privacy interest is present, other factors may affect a person's

19  reasonable expectation of privacy.  *Id*. (quoting *Hill*. 7 Cal.4th at 36).  One such factor is "the

20  presence or absence of opportunities to consent voluntarily to activities impacting privacy,"

21  while another is advance notice of the restrictions on privacy.  *Hill*, 7 Cal.4th at 36-37; *Barbee v.*

22  *Household Automotive Finance Corporation*, 113 Cal.App.4th 525, 533 (2003) (clear policy

23  about supervisors dating subordinates reduced supervisor's expectation of privacy in

24  relationship).

25          Dana has presented no evidence that she was unaware of UP's rules requiring

26  employees to report fraud against UP, but argues that these rules were not sufficiently clear to

diminish her expectation of privacy.  To counter this argument, UP relies on *Feminist Women's Health Center v. Superior Court*, 52 Cal.App.4th 1234 (1997).  In that case, the written qualifications of the job plaintiff accepted included a willingness to demonstrate cervical self-examination to groups, but plaintiff later asserted she was not told she would be required to disrobe and insert a speculum in her vagina in front of a group of health workers.  *Id.* at 1241.  The court said that "[p]laintiff's professed ignorance of the particulars of cervical self-examination does not vitiate her agreement to perform it."  *Id.* at 1247.  In this case, UP's general rules are not as clear as those in *Feminist Women's Health Center*; they do not establish as a matter of law that Dana's reasonable expectation of privacy in marital communication was destroyed.

UP also argues that Dana voluntarily revealed information about Jeremy's condition when she asked for a day off because her husband was in pain and when she answered questions at the disciplinary proceedings.  ECF No. 225 at 10; ECF No. 208 at 14.  Her single reference to Jeremy's pain two days after his accident, albeit to secure a day off, does not constitute a waiver of her right to privacy about further communications with Jeremy.  *Ortiz*, 98 Cal.App.4th at 1306 ("Ortiz did not sacrifice the whole of her intimate relationship . . . by telling [her supervisor] about one aspect of it.").  This one reference does not show a "voluntary consent to the invasive actions of defendant."  *Hill*, 7 Cal.4th at 26.

Nor does Dana's testimony at her disciplinary hearing retrospectively waive or necessarily destroy her expectation of privacy: while she may have given up her privilege for the purposes of that proceeding, this did not constitute a retrospective surrender of her right to privacy generally.  *See People v. Williams*, 43 Cal.4th 584, 613-15 (2008) (waiver of privilege of self-incrimination at one hearing does not constitute waiver for all subsequent proceedings).  The evidence of record on the pending motion does not show that either party is entitled to summary judgment on the question of waiver or diminution of Dana's reasonable expectation of marital privacy.

UP also argues that, in light of Dana's alleged diminished privacy expectation, its invasion was not substantial.  UP's policy required Dana to choose between marital privacy and employee loyalty and, when she chose not to report anything, subjected her to discipline and termination.  *Ortiz*, 98 Cal.App.4th at 1307 (serious invasion of marital privacy when employer asked employee to choose between marrying her fiancé and her job).

Just as UP does not seriously dispute that Dana has rights of marital privacy, Dana does not seriously dispute that UP has a legitimate interest in preventing fraud and employing people who are loyal to the company, despite her over-blown claims that UP required her to spy on Jeremy.  *See* ECF No 201 at 28 (conclusory argument about UP's countervailing interests).  As UP argues, it has a legitimate interest in enforcing rules against dishonesty or conflicts of interest.  *Ortiz*, 98 Cal.App.4th at 1313.  Dana has made no showing on this prong that would entitle her to summary judgment.

Dana has suggested a number of alternatives to the invasion of her privacy, that UP could have pursued, including the surveillance that UP in fact undertook, as well as inquiring directly of Jeremy's doctor about the reasons for his prescribed restrictions and any conflicts between restrictions and Jeremy's activities as shown on the video.  ECF No. 210 at 35.  UP has not addressed the feasibility of these alternatives or addressed how they impact the necessary balancing of its interests against those of Dana.  *See Hill*, 7 Cal.4th at 40.  Because Dana has not demonstrated the alternatives' practicality nor UP their impracticality, the existence of these alternatives precludes summary judgment.

C.  <u>Right To Privacy</u>

As this claim is based on the same invasion alleged in connection with Dana's termination, the same analysis applies.  The court finds neither party is entitled to summary judgment on the issues.

/////

/////

D.  Punitive Damages

Defendant argues it is entitled to summary judgment on plaintiffs' punitive damages claim, which is tethered largely to the privacy-related causes of action.  In light of the court's resolution of those claims, it declines to grant this portion of UP's motion.

E.  Affirmative Defenses

Plaintiffs move for summary judgment on defendant's fifth, sixth, seventh, eighth, eleventh, twelfth, fourteenth, fifteenth, eighteenth, nineteenth, twentieth and twenty-first affirmative defenses.  For the most part, their submission consists of conclusory allegations that the defenses are not supported evidence; they present no evidence themselves, nor do they point to anything in the record supporting their claims.  Some of their arguments are supported by legal argument.

When a plaintiff seeks summary judgment on affirmative defenses, he or she "'may satisfy [the] Rule 56 burden by showing "that there is an absence of evidence to support [an essential element] of the [non-moving party's] case."'" *Federal Deposit Insurance Corp. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30 (2d Cir. 1993)).  While it is not essential that the plaintiff negate elements of the affirmative defenses by submitting affidavits or other evidence, he or she must point to something showing the absence of supporting evidence.  Plaintiffs' challenges to the fifth, sixth, seventh, fifteenth, eighteenth, nineteenth, twentieth and twenty-first affirmative defenses are not supported by legal and factual discussion.

Defendant's eighth affirmative defense is that Jeremy's claim for injuries is barred unless a violation of regulations is established.  ECF No. 45 ¶ 71.  To the extent defendant bases this position on preclusion under the LIA, it is unavailing.  However, defendant also asserts that the cause of action may be barred by other statutes defining the duty of care.  Although there appears to be little likelihood that defendant will prevail on this defense in light of this court's ruling, plaintiffs have not demonstrated there are no material issues left to litigate.

1    The eleventh affirmative defense is estoppel or waiver.  Plaintiffs argue that UP

2  has not shown that Dana waived her right to privacy.  In light of this court's resolution of the

3  cross-motions on Dana's discharge claim, set forth above, the court declines to find waiver is

4  definitively not an issue in this case.  However, an answer must "set forth the circumstances

5  giving rise to the purported estoppel."  *Mission Housing Development Co. v. City & County of*

6  *San Francisco*, 59 Cal.App.4th 55, 75 (1997).  Here, the answer simply says that "each cause of

7  action . . . is barred by the doctrine of estoppel."  ECF No. 45 ¶ 74.

8    Defendant's twelfth affirmative defense is unclean hands.  The doctrine of

9  unclean hands bars a plaintiff from seeking equitable relief "only where some unconscionable act

10  of [the plaintiff] has immediate and necessary relation to the equity that he seeks in the matter in

11  ligation."  *See Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933).

12  Plaintiffs are not seeking equitable relief; summary judgment on this defense thus is appropriate.

13    Defendant's fourteenth cause of action seeks a limitation on damages allowable

14  under FELA.  While plaintiffs argue they are bringing claims not dependent on FELA, their

15  argument in support of summary judgment is unclear and so not well-taken.

16    Plaintiffs argue that defendant's seventeenth affirmative defense, which is based

17  on California's litigation privilege, does not apply to the FELA claim and does not apply to the

18  non-communicative conduct of wrongful termination and retaliation.  Plaintiffs have not shown

19  that the litigation privilege is inapplicable to the proceedings at issue.  *Beirbower v. FHP, Inc.*,

20  70 Cal.App.4th 1, 9 (1999).

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

Accordingly, for the foregoing reasons, IT IS THEREFORE ORDERED that:

1. Defendant's motion for summary judgment is DENIED.

2. Plaintiffs' motion for summary judgment is GRANTED IN PART, in that it is granted as to defendant's eleventh affirmative defense insofar as it is based on estoppel, and also as to defendant's twelfth affirmative defense.  Plaintiff's motion is DENIED in all other respects.

DATED:  July 26, 2011.

_____
UNITED STATES DISTRICT JUDGE