1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JEREMY GILMORE and
     DANA GILMORE,
12
                  Plaintiffs,                    CIV No. S-09-2180 KJM DAD
13          vs.

14   UNION PACIFIC RAIL ROAD
     COMPANY, et al.,                            ORDER
15
                  Defendants.
16   _____/

17          The parties have filed motions for reconsideration of certain of the court's prior

18   orders.  For the reasons set forth below, the motions are denied.

19   I. Background

20          Plaintiffs Jeremy and Dana Gilmore allege that after Jeremy was injured on the

21   job, defendant Union Pacific Rail Road (UP) fired Jeremy purportedly because he was

22   exaggerating his injury but really because he reported defective equipment and intended to

23   pursue an action under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51, *et seq.*[1]

24   Plaintiffs allege Jeremy's termination was in accordance with UP's policy of retaliating against

25   _____

26          [1]  The court refers to the plaintiffs by their first names so as to differentiate between
     them.

                                            1

employees who report on-the-job injuries and who intend to pursue claims for the injuries.  They also allege that Dana, Jeremy's wife and a supervisor at UP, was falsely accused of dishonesty and disloyalty for failing to provide information to UP about the extent of Jeremy's injuries; ultimately, she too was wrongfully discharged.  Plaintiffs' complaint includes causes of action for  negligence  (Jeremy), wrongful discharge in violation of public policy (Jeremy),  wrongful discharge for the assertion of the right to marital privacy (Dana), retaliation (Dana), intentional infliction of emotional distress (Jeremy and Dana) and invasion of privacy (Jeremy and Dana).  ECF No. 20.

The parties filed cross-motions for summary judgment.  As part of that motion practice, Dana conceded that her claim of retaliation was unfounded.  ECF No. 210 at 33.  The court denied both motions in significant part and, during the course of resolving the issues, it reached the following decisions, among others:   to the extent Jeremy's FELA negligence claim is based on the design of the locomotive door that allegedly struck his head and shoulder, it is not precluded by the Locomotive Inspection Act (LIA) and its corresponding regulations; and Jeremy had presented sufficient evidence of pretext to survive summary judgment on his termination claim.  The court declined to consider whether the appropriate standard for evaluating both Jeremy's and Dana's employment claims was that established by *Cotran v. Rollins Hudig Hall Intl., Inc*., 17 Cal.4th 93 (1998) or *Tameny v. Atlantic Richfield Co*., 27 Cal.3d 167 (1980).  *See generally* ECF No. 240.

Thereafter the parties filed a number of motions in limine and additional briefing on the appropriate standard for evaluating the employment claims.  In addition, UP contended that plaintiffs' attack on the adequacy of the investigation and hearing as part of their evidence of pretext would require an interpretation of the Collective Bargaining Agreement (CBA), which in turn would mean the claims are preempted under the Railway Labor Act (RLA).  UP therefore sought to exclude any evidence and argument that the investigations and hearings were unfair.  ECF No.  309.  In response, the court determined that *Tameny* provided the appropriate measure

1   of the discharge claims and that plaintiffs' pretext claims could not be based on evidence or

2   argument that the investigations and hearings were unfair.   *See generally* ECF No. 448.

3         The parties have now filed motions to reconsider.  Plaintiffs challenge the court's

4   order regarding *Tameny's* application to the employment claims, while UP asks the court to

5   revisit its ruling on summary judgment in two respects, arguing first that the RLA preemption

6   ruling undercuts the court's conclusion concerning plaintiffs' evidence of pretext, and second

7   that a recently decided Supreme Court case should change the ruling on LIA preemption of the

8   design defect component of Jeremy's FELA claim.

9   II.  <u>*Tameny* or *Cotran* Applicable to Employment Claims</u>

10         In *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167 (1980), the California

11   Supreme Court explored the nature of the remedy when an employer has fired an at will

12   employee in violation of some public policy.  The court concluded that "when an employer's

13   discharge of an employee violates fundamental principles of public policy, the discharged

14   employee may maintain a tort action and recover damages traditionally available in such

15   actions."  *Id*. at 170.   The court recognized that this doctrine was a limitation on an employer's

16   authority to discharge an at will employee for no reason.  *Id*. at 172.  Although the cause of

17   action of a discharge in violation of public policy thus arose in the context of at will

18   employment, the California courts recognize that an employee may bring a tort action for

19   discharge in violation of public policy even when there is an employment contract:

20        [T]he cause of action was not dependent on an express or implied
   promise in the employment contract, but rather reflects a duty

21        imposed by law upon all employers in order to implement the
   fundamental public policies embodied in the state's penal statutes.

22        . . . [T]he existence of a contractual relationship would not bar an
   injured party from seeking relief through tort remedies when the

23        employer's discharge of an employee contravenes the dictates of
   public policy.

24

25   *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 666-67 (1988) (internal citation, quotation

26   omitted).

3

1    By finding the *Tameny* standard to be applicable in this case, this court did not

2    find that Jeremy and Dana were at will employees, but rather found they were asserting a claim

3    based in public policy, available to those with employment contracts as well as those without.

4    Similarly, by quoting a portion of *Cotran* regarding the investigation plaintiffs claimed was

5    necessary before they could be discharged, the court did not mean to imply that UP need not

6    honestly believe it had legitimate business reasons for terminating Jeremy and Dana. *Villiarimo*

7    *v. Aloha Island Air, Inc*., 281 F.3d 1054, 1063 (9th Cir. 2002); *Guz v. Bechtel Nat., Inc*.,

8    24 Cal. 4th 317, 358 n.22 (2000); *see Pomeroy v. Wal-Mart Stores, Inc*., 834 F. Supp. 2d 964,

9    977 (E.D. Cal. 2011) ("'good cause' in the context of implied employment contracts is defined

10   as 'fair and honest reasons, regulated by good faith on the part of the employer, that are not

11   trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual'").  Finally, to

12   the extent plaintiffs argue that they are entitled to rely on the *Cotran* framework for analyzing

13   their discharge claims, they are mistaken.  As discussed more fully below, the CBA requires a

14   showing of good cause to support a discharge; even assuming that plaintiffs have made a

15   showing of an implied agreement in addition to the CBA, a party may not bring a cause of action

16   on an implied-in-fact contract where an express contract between the parties covers the same

17   subject matter.  *Phillips Medical Capital, LLC v. Medical Insights Diagnostics Centers, Inc*.,

18   471 F. Supp. 2d 1035, 1047 (N.D. Cal. 2007) (quoting *Lance Camper Manufacturing Corp. v.*

19   *Republic Indemnity Co*., 44 Cal. App. 4th 194, 203 (1996)).

20   Finally, as noted in previous orders, some courts have found the *Cotran*-mode of

21   analysis applicable in *Tameny* wrongful discharge cases.  None of that authority is binding on

22   this court.   Nothing plaintiffs have presented in this motion persuades the court that its earlier

23   resolution of this issue is in error.

24   III.  RLA Preemption

25   Plaintiffs argue that amendments to 49 U.S.C. § 20109 render irrelevant any claim

26   that their termination actions are preempted.  Before the amendments, they contend, an

4

employee's sole remedy for a retaliatory discharge was under the FRSA and the RLA, but the amended statute now provides that the section does not preempt or diminish safeguards against retaliation provided by federal or state law or diminish the rights and remedies of any employee under state or federal law or any collective bargaining agreement.  Rather, it allows them to pursue their claims without the preemptive effect of the RLA.  49 U.S.C. § 20109, subds. (g) & (h).  However, the amendments to § 20109 were designed to expand the remedies available to a railroad whistleblower by overturning the body of law holding that a whistleblower's remedy was limited to a FRSA retaliation claim and permitting a state law suit for wrongful discharge as well; they say nothing about the interaction between the RLA and state law wrongful termination claims.  *Gonero v. Union Pacific Rail Road Co.*, No. CIV 2:09-2009 WBS JFM, 2009 WL 3378987, at * 5 (E.D. Cal. Oct. 19, 2009).

Plaintiffs' next claim is not so easily resolved.  "Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994).  "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Id.*; *see also Felt v. Atchison, Topeka & Santa Fe Ry. Co.*, 60 F.3d 1416, 1419 (9th Cir. 1995).  Towards this end, the RLA establishes dispute resolution mechanisms for two classes of claims: first, "major disputes," which relate to the formation of collective bargaining agreements and concern rates of pay, rules or working conditions; second, "minor disputes" which "gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a. "Thus, 'major disputes seek to create contractual rights, minor disputes to enforce them.'" *Hawaiian Airlines*, 512 U.S. at 253 (quoting *Consolidated Rail Corp. v. Railway Labor Executives' Assn.*, 491 U.S. 299, 302 (1989) *(Conrail)*).

Minor disputes must be resolved through mechanisms set forth in the RLA. *See* 45 U.S.C. § 184; *Felt*, 60 F.3d at 1419. "The distinguishing feature of [a minor dispute] is that

5

1   the dispute may be conclusively resolved by interpreting the existing [CBA]." *Conrail*, 491 U.S.

2   at 305. "[A] minor dispute cannot involve rights that emanate from sources outside the

3   agreement." *Felt*, 60 F.3d at 1419. If a claim can be resolved without resort to the applicable

4   collective bargaining agreement, the claim is not a preempted "minor dispute." *See Hawaiian*

5   *Airlines*, 512 U.S. at 263 (noting the Court's adoption of a "contract-dependent standard for

6   minor disputes").  Preemption principles developed in cases interpreting the Labor Management

7   Relations Act (LMRA) inform the resolution of RLA preemption questions.  *Espinal v.*

8   *Northwest Airlines*, 90 F.3d 1452, 1456 (9th Cir. 1996).

9          The Supreme Court considered the intersection of state tort law and preemption

10  under the LMRA in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410 (1988).

11  In *Lingle*, the plaintiff was discharged for filing a false claim for workers' compensation.  She

12  pursued a grievance through the CBA governing her plant, which protected workers from

13  discharge except for just cause.  The arbitrator ruled in her favor and ordered her reinstated.  She

14  also brought suit in Illinois state court, alleging she was discharged for exercising her rights

15  under Illinois workers' compensation laws.  *Lingle*, 486 U.S. at 402-03.  The district court and

16  the Seventh Circuit ruled that her claim was preempted by the LMRA.

17         The Supreme Court reversed.  It recognized that the Illinois cause of action for

18  retaliatory discharge required a court to resolve

19             purely factual questions pertain[ing] to the conduct of the
              employee and the motivation of the employer.  Neither of the
20            elements requires a court to interpret any term of the collective-
              bargaining agreement.  To defend against a retaliatory discharge
21            claim an employer must show that it had a non-retaliatory reason
              for the discharge; this purely factual inquiry likewise does not turn
22            on the meaning of any provision of the collective-bargaining
              agreement.  Thus the state-law remedy is 'independent' of the
23            collective-bargaining agreement. . . .

24  *Id*. at 407 (internal citations omitted).  The Court addressed the Court of Appeals' concern that

25  /////

26  /////

the lower court would consider the same issue as the arbitration board and undertake the same

analysis:

> We agree with the court's explanation that the state-law analysis
> might well involve attention to the same factual considerations as
> the contractual determination of whether Lingle was fired for just
> cause. But we disagree with the court's conclusion that such
> parallelism renders the state-law analysis dependent upon the
> contractual analysis. . . . . [E]ven if dispute resolution pursuant to a
> collective-bargaining agreement, on the one hand, and state law,
> on the other, would require addressing the same set of facts, as
> long as the state-law claim can be resolved without interpreting the
> agreement itself, the claim is 'independent' of the agreement. . . .

*Id*. at 408-10. The Court continued that even if a CBA contained provisions against retaliatory

discharge that coincided with state law, this circumstance does not render the "existence or

contours of the state law violation dependent upon the terms of the private contract." *Id*. at

412-13. A "typical case" of retaliatory discharge will not "depend[] upon the meaning of a

collective bargaining agreement." *Id*. at 405-06.

In *Hawaiian Airlines,* the Court returned to preemption of state law claims, but

this time in an RLA case. In that case, Norris, an aircraft mechanic who refused to certify that a

particular repair was performed in a satisfactory manner, was suspended and then reported his

concerns to the FAA. At a grievance hearing under the CBA, he was terminated for

insubordination, which constituted good cause. He filed suit alleging that he was wrongfully

terminated in violation of public policy. 512 U.S. at 249-50. Hawaiian Airlines (HAL) removed

the case to federal court and sought to dismiss his claim as preempted by the RLA.

The Court noted that "the RLA's mechanism for resolving minor disputes does

not pre-empt causes of action to enforce rights that are independent of the CBA." *Id*. at 256. It

continued that the CBA was not the only source of Norris's right not to be discharged wrongfully

and that "the 'only source' respondent asserts . . . is state tort law. Wholly apart from the CBA,

petitioners had a state-law obligation not to fire respondent in violation of public-policy . . . ."

*Id*. at 259. Norris's obligation to pursue a grievance did not relieve HAL of this duty. *Id*. at 258.

The Court relied on *Lingle* in concluding that the RLA did not pre-empt Norris's claim, even though the CBA might "'be consulted in the course of the state-law litigation. . . .'" *Id.* at 261 n.8 (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994)).

The Supreme Court has recognized that several, sometimes analytically distinct situations are covered under the rubric of preemption:

> [S]ometimes [defendants'] assertion is that a plaintiff's cause of action itself derives from the collective-bargaining agreement (and, by that agreement, belongs before an arbitrator); in other instances, the argument is that a plaintiff's claim cannot be "resolved" absent collective-bargaining agreement interpretation, *i.e.*, that a term of the agreement may or does confer a defense on the employer (perhaps because the employee or his union has negotiated away the state-law right), and in other cases still, concededly independent state-law litigation may nonetheless entail some collective-bargaining agreement application.

*Livadas*, 512 U.S. at 124 n.18.  In *Livadas*, the Court found that the plaintiff's claim, that the employer failed to pay her wages promptly upon her termination, was entirely a question of state law, requiring only that a court "look to" the CBA for computation of damages.  *Id.*  "Beyond that, . . . the collective-bargaining agreement is irrelevant to the dispute. . . ." *Id.* at 125.

Ultimately, whether a claim is preempted must be determined on a case by case basis.  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).  "[T]he determinative question 'is whether "the state law factual inquiry . . . turn[s] on the meaning of any provision of the collective bargaining agreement."'" *Ward v. Circus Circus Casinos, Inc.*, 473 F.3d 994, 998 (9th Cir. 2007) (quoting *Galvez v. Kuhn*, 933 F.2d 773, 776 (9th Cir. 1991) (quoting *Ackerman v. W. Elec. Co.,* 860 F.2d 1514, 1517 (9th Cir. 1988))).

The Ninth Circuit has recognized that "[t]he demarcation between preempted claims and those that survive § 301's reach is not . . . a line that lends itself to analytical precision," because "'[s]ubstantial dependence' on a CBA is an inexact concept, turning on the specific facts of each case, and the distinction between 'looking to' a CBA and 'interpreting' it is not always clear or amenable to a bright line test." *Cramer v. Consolidated Freightways, Inc.*,

1   255 F.3d 683, 691 (9th Cir. 2001) (en banc); *see also Mendes v. W.M. Lyles Co.*, No. CIV

2   F 07-1265 AWI GSA, 2008 WL 171003, at *5 (E.D. Cal. Jan. 18, 2008) (in preemption context,

3   "interpret" is narrowly defined to mean something more than consider, apply, or mention).

4   Indeed, it is the imprecision of the standard that has prompted plaintiffs' motion to reconsider

5   and this court's initial and renewed examination of this issue.

6          As this court previously determined, a cause of action for retaliatory discharge

7   arises directly from state law. *Saridakis v. United Airlines*, 166 F.3d 1272, 1278 (9th Cir. 1999)

8   (state tort claims of wrongful discharge exist independent of the CBA); *German v. Vulcan*

9   *Materials Co.*, 106 F.Supp.2d 1010, 1014 (S.D. Cal. 2000) (*Tameny* claim is independent of

10  CBA).  In determining whether this "concededly independent state-law litigation" would entail

11  some interpretation of the CBA, the court examined what plaintiffs suggested they would offer

12  as evidence of UP's motivation in terminating them, which revolved around perceived

13  inadequacies in the hearings and investigations.  As part of the summary judgment proceedings,

14  plaintiffs argued that they had established pretext by showing, among other things, that Magures,

15  one of the managers, arranged for Jeremy to be videotaped shortly after the accident, when

16  Jeremy was still at work and before Jeremy's doctor put additional restrictions on his duties; that

17  UP did not videotape Jeremy at work; that no one from UP talked to a doctor about Jeremy's

18  injuries and work restrictions; that UP presented no medical evidence at the disciplinary

19  proceedings; that Carolyn Will, the hearing officer in Jeremy's case, was biased as shown by her

20  participation in drafting the letters that removed both plaintiffs from service; that Will did not

21  consult any medical professionals or become familiar with medical issues and believed UP could

22  carry its burden without medical testimony to show that Jeremy was lying about the extent of the

23  injuries; that in other disciplinary proceedings, UP has presented doctors' testimony; that neither

24  Jeremy nor his union representative had been told about the surveillance video nor given a

25  chance to review it before the hearing.  *See* ECF No. 210 at 20-27.

26  /////

1          As a starting point for this reexamination, the court first considers "a breakdown

2    of the elements and the burdens of Plaintiff's . . . claim, the crux of Plaintiff's complaint and the

3    claim most likely to require interpretation of the CBA." *McGowen v. Nestle Food Co.*,

4    No. 1:06cv1212 AWI DLB, 2007 WL 173768, at *4 (E.D. Cal. Jan. 19, 2007).   In order to prove

5    a claim for discharge in violation of public policy, a plaintiff must show (1) an employee-

6    employer relationship (2) the termination violated public policy, (3) the termination was the legal

7    cause of plaintiff's damage, and (4) the extent of the damage. *London v. Sears, Roebuck and*

8    *Co.*, 619 F.Supp.2d 854, 862 (N.D. Cal. 2009), *aff'd*., 458 F. App'x. 649 (9th Cir. Nov. 16,

9    2011); *Holmes v. General Dynamics Corp*., 17 Cal. App. 4th 1418, 1427 (1993); *see also Garley*

10   *v. Sandia Corp*., 236 F.3d 1200, 1213 (10th Cir. 20 01) (even if employee violated company

11   rules, giving employer just cause for termination, question is whether the motivation for the

12   discharge was the rule violation or retaliation for protected activity).

13         If a plaintiff establishes a prima facie case of retaliatory discharge, then the

14   burden shifts to the defendant to show a legitimate, non-retaliatory reason for the discharge.

15   Plaintiff may attempt to rebut this showing, if met, by offering evidence of pretext by showing

16   either that  unlawful reasons motivated the employer or the explanation is unworthy of credence.

17   *Anderson v. Union Pacific Rail Road Co*., Civ. No. S-06-2813 FCD GGH, 2008 WL 2130320, at

18   *9 (E.D. Cal. May 21, 2008), *aff'd*., 359 F. App'x. 800 (9th Cir. Dec. 4, 2009).  One way of

19   demonstrating pretext is by showing that the employer did not follow its own procedures or

20   protocol. *Porter v. California Department of Corrections*, 419 F.3d 885, 896 (9th Cir. 2005);

21   *Hysten v. Burlington Northern Santa Fe Railway Co*., 415 F. App'x 897 (10th Cir. 2011)  ("'the

22   standard for establishing pretext requires evidence of not just any procedural shortfall, but of a

23   '*disturbing* procedural irregularity.'") (emphasis in original, quoting *Cooper v. Wal-Mart Stores,*

24   *Inc*., 296 F. App'x 686, 696 (10th Cir. 2008)); *Weinstock v. Columbia University*, 224 F.3d 33,

25   45 (2d Cir. 2000).  "But, proof of an irregularity requires proof of the standard or ordinary

26   procedure." *DeGraw v. Exide Technologies*, 744 F. Supp. 2d 1199, 1219 (D. Kan. 2010), *aff'd*,

462 F. App'x 800 (10th Cir. Feb. 12, 2012); *Lujan v. Exide Technologies*, No. 10-4023 JTM, 2012 WL 380270, at *13 (D. Kan. Feb. 6, 2012) (the only way plaintiff could show that supervisor's failure to consult someone with medical training to evaluate his claimed restrictions was irregular would be to show that employer "typically used someone with medical training when making termination decisions").  Here, because plaintiffs' evidence of pretext relied on procedural irregularities, the court relied on *Monroe v. Missouri Pacific Rail Road Co.*, 115 F.3d 514 (7th Cir. 1997) and *Weathersby v. Union Pacific Railroad Co.*, No. 01 C 0264, 2003 WL 22038584 (N.D. Ill. Aug. 28, 2003).

          In *Monroe*, the railroad pursued disciplinary proceedings against Monroe after he had taken a medical leave of absence yet was employed by his father, selling and installing satellite dishes.  *Monroe*, 115 F.3d at 515.  At the hearing, the railroad produced surveillance video of Monroe's activities and testimony from a doctor who had not examined Monroe but nevertheless testified that he could perform his railroad duties.  Monroe was discharged for misrepresenting his physical condition.  *Id*.  He sued, alleging wrongful discharge under FELA. *Id*. at 516.  The court followed the *Hawaiian Airlines* analysis and first determined that the source of Monroe's claims was independent of the CBA because the claims arose from FELA and Illinois public policy.  *Id*. at 518.  But it then considered that Monroe claimed the railroad had failed to invoke its right under the CBA to compel him to submit to a medical examination and the CBA itself included standards concerning an employee's physical condition, and that Monroe questioned the propriety of the disciplinary hearing as well as the testimony from the non-examining physician.[2]  The court said that *Hawaiian Airlines* made the determination "a close case (or at least a much closer one than before *Hawaiian Airlines* was decided)," but
/////

_____

          [2]  The court also said that Monroe's claims about past and future wages and benefits would be determined under the CBA, but recognized that this claim by itself would not compel a finding that the claims were preempted.  *Id*. at 518 n.4.

concluded that "the factual particularities of Monroe's complaint . . . require an interpretation of the CBA. . . ." *Id*. at 518.

In *Monroe*, the complaint specifically identified alleged failures to abide by the CBA in describing the cause of action; in this case, plaintiffs did not refer to the CBA or even to any procedural irregularities in their complaint.   However, in *Weathersby v. Union Pacific Rail Road Co*., *supra*, the court ultimately found a state law claim preempted even though the plaintiff never mentioned the CBA.   Weathersby pursued two FELA claims, a Title VII claim based on employment discrimination, and a state law wrongful discharge claim alleging that UP had fired him in order to avoid reporting the two injuries that were the subjects of his FELA claims.   2003 WL 22038584, at *1.   Plaintiff argued that his wrongful discharge claim was not preempted by the RLA because it required "a factual determination of whether Union Pacific retaliated against him to avoid paying damages on his FELA claim."   *Id*. at *3.   The court disagreed, noting that because Weathersby alleged that UP's stated reasons for his termination were a pretext, "this determination will involve a review of standards and procedures which are set forth, either explicitly or implicitly, in the CBA," specifically whether UP investigated properly and followed its disciplinary procedures.   *Id*. at *4; *see Wolfe v. BNSF Railway Co*., No. CV 09-166 BLG-RFC-SC, 2011 WL 3895127 (D. Mont. Aug. 29, 2011), *adopted by* 2012 WL78404 (D. Mont. Jan. 10, 2012) (plaintiff's state law cause of action for mismanagement preempted when it was based on alleged inadequacies in the investigation and hearing that preceded his termination); *see also DeTomaso v. Pan American World Airlines*, 43 Cal.3d 517, 530 (1987) (challenge to the investigation of theft preempted under RLA because the reasonableness of the procedures was subject to CBA's grievance procedures).[3]

---

[3] Plaintiffs take issue with the citation to *DeTomaso*, as it predates *Hawaiian Airlines* and *Lingle*.   This court previously did not cite *DeTomaso* for its standard – that an action is preempted if the conduct is arguably governed by a CBA – as that standard is no longer appropriate.   Rather, the court cited it as an illustration of the kind of case that might be subject to preemption.   *See Ware v. Burlington Northern Santa Fe Railway*, No. CIV. S-05-2110 WBS DAD, 2006 WL3741897 (E.D. Cal. Dec. 18, 2006) (citing *DeTomaso* for its summary of

1   　　　　　In this case, plaintiffs say they "do not dispute the CBA procedures were

2   followed." ECF No. 456-1 at 23.   They argue that their termination was predetermined by

3   Magures and Parker with the cooperation of managers in Omaha, and that UP's conduct "was a

4   charade, not that procedures should have been done differently." ECF No. 465 at 8.  They argue

5   that apart from the requirements of the CBA, UP did not follow its own policies and procedures.

6   *Id*. at 9.  The policies and procedures plaintiffs reference appear to be the Union Pacific's

7   Manager Guide to the Discipline Process, "which describes an employee's due process rights" as

8   including a full, fair and impartial hearing, notice of the charges, an opportunity to prepare a

9   defense, union representation, and the right to call witnesses, cross-examine witnesses and

10  produce evidence; the guide also says that witnesses with first hand knowledge should be

11  produced by UP.  ECF No. 210 at 23.   Plaintiffs have pointed to nothing that says this guide is

12  the source of any rights to a particular procedure.

13  　　　　　The guide's provisions do echo the CBA's provision governing hearings, which

14  establishes an employee's rights before discipline is imposed.  The CBA provides in relevant

15  part:

16  　　　　　　　　No employe shall be disciplined without a fair and impartial
    　　　　　　　　hearing by an Officer of the Company. . . .
17
    　　　　　　　　When a hearing is to be held, the employe involved shall be
18  　　　　　　　　notified in writing of the precise charge(s).  Such charge(s) shall be
    　　　　　　　　served on the employe within seven (7) days of the date the local
19  　　　　　　　　Carrier Officers become aware of the incident or event giving rise
    　　　　　　　　to the charge(s).
20
    　　　　　　　　. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
21
    　　　　　　　　. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
22

23  /////

24  /////

25

26  preemption cases).

> Formal hearing shall be conducted within ten (10) days of the date
> the employe is charged.  A reasonable postponement. . . shall be
> granted.  The employe shall have the right to representation . . .,
> and the right to have present at the hearing witnesses who have
> direct knowledge of the event or incident . . . .

ECF No. 457-2 at 6.  The guide does not appear to have any independent force apart from being an interpretive guide; it purports to describe the employee's rights and as those rights flow from the CBA, a failure to comply with its provisions is a failure to comply with the CBA.  How is the court to determine whether a hearing is fair, under either the Manager's Guide or the CBA?  Perhaps by analyzing the "broad range of implied, unwritten terms arising from practice, usage and custom" or norms the parties have created but have omitted from the CBA's *explicit* language. . . ." *Carmona v. Southwest Airlines Co*., 536 F.3d 344, 349 (5th Cir. 2008) (internal citation, quotation omitted; emphasis in original); *compare Allis-Chalmers Corp. v. Lueck*, 471 U.S. at 216 (parties nay determine what would constitute reasonable performance of contractual obligations).

The court's task is complicated by this case's unusual posture.  The RLA preempts causes of action, yet the court has drawn on the preemption doctrine as an evidentiary guide.  It has not dismissed the termination claims as preempted but rather ruled that evidence of pretext that, on the facts of this case, constitutes a collateral attack on the hearing procedures is not relevant because of the preemption doctrine.  Neither plaintiff will be allowed to present evidence of irregularities in the investigation or hearing that led to his or her respective termination.  To consider whether these procedures were irregular will require an interpretation of the relevant portions of the CBA, written or not.

The court recognizes that Jeremy has other evidence of pretext that does not, as far as the court understands it, implicate the CBA.  As noted in the order denying summary judgment, there is evidence that soon after Jeremy's accident and his report suggestion that a defect and improper maintenance were the causes,  his manager vetoed a suggested that Jeremy be given the Noggin Club award for avoiding serious injury because he was wearing his hard

14

1   hat, noting instead that Jeremy appeared to be accident prone, having suffered two "reportable"

2   injuries as well as another.  There is also evidence that managers receive bonuses for maintaining

3   accident-free shops.   As noted in the order denying summary judgment, these facts satisfied

4   Jeremy's minimal burden of presenting evidence suggesting that the reasons for his discharge

5   were pretextual.  ECF No. 240 at 19-20.  Because there is evidence of pretext apart from the

6   conduct of the disciplinary proceedings, UP's request that the court reconsider its summary

7   judgment ruling on the employment claims is denied.

8   IV.  *Kurns* and the LIA

9        In its motion for summary judgment, UP argued that because the Locomotive

10  Inspection Act ("LIA") regulates "the design, construction, and the material of every part of the

11  locomotive . . . and of all appurtenances" and because it "was intended to occupy the field" and

12  thus preempts state regulations and lawsuits based on locomotive design, Jeremy's design defect

13  claim is precluded by the LIA, which does not require that the air brake compartment doors be

14  made of fiberglass or have different or additional latches. *Napier v. Atlantic Coast Line R.* Co.,

15  272 U.S. 605, 612-13 (1926).  This court rejected the argument, finding that the preemption of

16  state laws did not necessarily mean that an action based on another federal statute was

17  necessarily precluded.

18       UP asks the court to revisit this ruling in light of *Kurns v. Railroad Friction*

19  *Products Corp.*, ___ U.S. ___, 132 S.Ct. 1261 (2012).  In *Kurns*, the Supreme Court considered

20  whether state-law tort claims for defective design and failure to warn were preempted by the

21  LIA.  *Id*. at 1265.  The Court rejected petitioners' claims that the LIA's preemptive effect did not

22  extend to state law claims as opposed to state regulations: "*Napier* . . . held that the LIA

23  'occupied the entire field of regulating locomotive equipment' to the exclusion of state

24  regulation. That categorical conclusion admits of no exception for state common-law duties and

25  standards of care" because an award of damages is a "method of governing conduct and

26  controlling policy." *Id*. at 1269 (quoting *San Diego Building Trades Council v. Gammon*,

359 U.S. 236, 247 (1959)).  *Kurns* says nothing about the relationship between the LIA and FELA claims and does not discuss whether the LIA precludes a federal claim for defective design.  While *Kurns* reaffirms the broad reach of the LIA in preempting state regulation and state common-law actions, as originally explained in *Napier*, it is silent on the question in this case: whether that portion of Jeremy's FELA claim based on a design defect is precluded by the LIA.

UP again argues those cases that have found the LIA to preclude certain FELA claims, but has not persuaded the court that its earlier rejection of these cases was wrong.

> FELA and LIA are "remedial and humanitarian" statutes that impose two separate types of liability to protect the safety of railroad employees.  FELA permits railroad workers to recover for injuries caused by the negligence of their employers or fellow employees.  LIA, on the other hand, imposes "an absolute duty" on railroad carriers to ensure that their locomotives are both properly maintained and safe to operate.

*Matson v. Burlington Northern Santa Fe Railroad*, 240 F.3d 1233, 1235 (10th Cir. 2001) (internal citation omitted).  "Therefore, the LIA, when read in conjunction with section 3 of FELA, fastens strict liability on railroad carriers who violate its safety standards."  *Granfield v. CSX Transportation, Inc*., 597 F.3d 474, 480 (1st Cir. 2010).  It makes little sense to find that a statute that serves as an amendment to the FELA, making it easier in some cases for injured workers to pursue their claims, also restricts the kind of claims workers can bring, particularly in light of the "humanitarian" purpose of both statutes.  *Urie v. Thompson*, 337 U.S. 163, 188 (1949) (the LIA is "substantively, if not in form amendments to the Federal Employers' Liability Act").  *Kurns*, which discusses only preemption, does not undercut this court's earlier ruling.

IT IS THEREFORE ORDERED that the motions for reconsideration (ECF Nos. 447, 456, 457) are denied.

DATED:  August 2, 2012.

UNITED STATES DISTRICT JUDGE